1  ANTHONY J. SPERBER, Bar No. 197962
   LAW OFFICE OF ANTHONY J. SPERBER
2  1808 Sixth Street, Berkeley, CA 94710
   Tel: 510.845.8844
3  Fax: 510.845.1998
4  anthony@sperberlaw.com

5  Attorneys for Plaintiffs CHARLES DAVIDSON
   and CD & PWS ENTERPRISES, INC.
6

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHEN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

12  CHARLES DAVIDSON and CD & PWS          Case No.  C 08-01756 BZ
    ENTERPRISES, INC.,
13                                         **PLAINTIFFS' MEMORANDUM OF POINTS
                        Plaintiffs         AND AUTHORITIES IN OPPOSITION TO
14                                         DEFENDANTS' MOTION TO DISMISS
         v.                                PLAINTIFFS' COMPLAINT**
15
    CONOCOPHILLIPS COMPANY and DOES
16  1 through 100,                         Date: July 2, 2008
                                           Time: 10:00 a.m.
17                      Defendants.        Courtroom: G
                                           Judge: Hon. Bernard Zimmerman
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION & STATEMENT OF ISSUES TO BE DECIDED ......................................... 1

II.     STATEMENT OF FACTS ......................................................................... 1

    A.    The Parties Start With A Strong Business Relationship ........................................ 1

    B.    Defendant Offers An Expansion Opportunity, Which Plaintiffs Accept
        Allowing For The Successful Remodeling Of The Station's Snack Shop............................ 1

    C.    Defendant Offers Another Expansion Opportunity, Which Plaintiffs Accept
        Leading To The Successful Installation Of A Car Wash ........................................ 2

        1.    Plaintiff Accepts Defendant's Offer Letter............................................... 2

        2.    Plaintiffs Spend Two Years And Tens Of Thousands Of Dollars To Plan
            For The Car Wash And Obtain Municipal Approval...................................... 2

        3.    Defendant Helps Plaintiffs Obtain A Loan, Which Plaintiffs Cannot Get On
            Their Own Because Defendant Owns The Land On Which The Car Wash
            Will Be Constructed.................................................................. 3

        4.    As The First Loan Payment Becomes Due, Plaintiffs Approach Defendant
            About The Reimbursement Plan—And Is Hit With A Bombshell........................... 3

        5.    Plaintiffs Are Forced To Complete The Car Wash Installation Project ..................... 4

        6.    In Token Response To Plaintiffs' Complaints, Defendant Makes A Bad-Faith
            Offer, Which It Knows Plaintiffs Cannot Accept........................................ 4

        7.    As A Direct Result Of Defendant's Unfair Business Practices, Plaintiffs'
            Financial Condition Begins To Falter And They Lose Their Other Station................ 4

        8.    Plaintiffs Lose The San Ramon Station And Everything They Had Invested ............. 5

        9.    Mr. & Mrs. Davidson Face A Total Financial Collapse .................................. 5

III.    LEGAL ARGUMENT ............................................................................ 6

    A.    The PMPA Does Not Preempt Any Of Plaintiffs Claims ...................................... 6

        1.    The PMPA's Preemptive Scope Is Limited ............................................. 6

        2.    The PMPA Does Not Preempt Plaintiffs Claims Because Plaintiffs Are Suing
            For Breach Of An Independent Contract And Defendant's Tortious Conduct,
            Not For Termination Of The Franchise Agreement ...................................... 7

            a.    *Pride v. Exxon Corp.*, 911 F.2d 251 (9th Cir.1990) ........................... 8

            b.    *Seckler v. Star Enterprise*, 124 F.3d 1399 (11th Cir. 1997) ................... 9

            c.    *Forty-Niner Truck Plaza v. Union Oil*, 58 Cal. App. 4th 1261 (1997)............. 10

d.    *California Service Station & Automotive Repair Assoc. v. Union Oil Company of California*, 232 Cal. App. 3d 44 (1991)................................................................. 10

e.    *Amoco Oil Company v. Ervin*, 908 P.2d 493 (Colo. 1996)......................................... 10

B.   The Parol Evidence Rule Does Not Bar Plaintiffs' Contract Claim ..................................... 11

1.   Plaintiffs Are Not Seeking To Introduce Extraneous Evidence To Interpret The 2007 Franchise Agreement, But Merely To Assert Their Rights Under A Separate Contract Altogether........................................................................................................ 11

2.   The Parol Evidence Rule Does Not Apply Because The 2007 Franchise Agreement Was Not Fully Integrated .......................................................................... 12

3.   Even If The 2007 Franchise Agreement Had Been Fully Integrated, The Parole Evidence Rule Would Not Prevent Plaintiffs From Offering Certain Evidence To Challenge Defendant's Interpretation Of The Agreement ..................... 13

a.    Parol Evidence Is Permitted To Challenge The Validity Of The Contract ...... 13

b.    Parol Evidence Is Permitted To Aid In The Interpretation Of Ambiguities..... 13

c.    Parol Evidence Is Permitted To Correct Mistakes Or Omissions .................... 14

d.    Parol Evidence Is Permitted To Show A Consistent Collateral Agreement..... 14

4.   Parol Evidence Is Not Allowed, The Franchise Agreement Must Be Reformed On The Grounds Of Mistake, Duress, And Unconscionability ................ 16

a.    Reformation Based On Mistake........................................................................ 16

b.    Reformation Based On Duress ......................................................................... 16

c.    Reformation Based On Unconscionability ....................................................... 17

C.   The Statute Of Frauds Does Not Bar Plaintiffs' Claim........................................................ 18

D.   The Documents Referenced In The Complaint Are Evidence Of A Contract, Whether Oral, Implied Through Conduct, Or Written............................................................ 19

E.   Plaintiffs Have Properly Pled Their Causes Of Action For Misrepresentation ................... 20

1.   Plaintiffs Have Alleged Actionable Concealment By Defendant................................ 20

2.   Plaintiffs Have Alleged Defendant's Knowledge Of Falsity..................................... 21

3.   Plaintiffs Have Alleged Their Justifiable Reliance................................................... 22

4.   Plaintiffs Are Not Required To Alleged A Resulting Benefit To Defendant, But They Have Nevertheless Done So....................................................................... 23

F.   Plaintiffs Have Stated A Claim Under Business & Professions Code Section 17200........ 24

IV.   CONCLUSION ............................................................................................................................. 25

1

# TABLE OF AUTHORITIES

2

<u>FEDERAL STATUTES & RULES</u>

3

15 U.S.C. § 2801......................................................................................................................6

4

Fed. R. Civ. Proc. 9...............................................................................................................21

5

6

<u>STATE STATUTES & RULES</u>

7

Cal. Bus. & Prof. Code § 17200 ...............................................................................10, 24, 25

8

Cal. Civ. Code § 1550............................................................................................................11

9

Cal. Civ. Code §§ 1568 .........................................................................................................11

10

Cal. Civ. Code § 1577............................................................................................................11

11

Cal. Civ. Code § 1578............................................................................................................11

12

Cal. Civ. Code § 1580............................................................................................................11

13

Cal. Civ. Code §§ 1640 .........................................................................................................14

14

Cal. Civ. Code § 1654............................................................................................................12

15

Cal. Civ. Code § 1670.5.........................................................................................................17

16

Cal. Civ. Code § 3399......................................................................................................14, 16

17

Cal. Code Civ. Proc. §§ 1856 ..........................................................................................13, 15

18

Cal. Com. Code § 2202..........................................................................................................15

19

20

<u>FEDERAL CASES</u>

21

*Arbabian v. BP America,* 898 F.Supp. 703 (N.D.Cal.1995) ...................................................8

22

*Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 305 (2d Cir.1986)..............................................6

23

*Comerica Bank v. McDonald*, 2006 WL 3365599 (N.D.Cal. 2006) ....................................20

24

*Committee of Dental Amalgam Mfrs. v. Stratton,* 92 F.3d 807 (9th Cir 1996) ....................6

25

*Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825 (9th Cir. 1971) ...........................19

26

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086 (C.D.Cal. 1999)....................23

27

*Giuliano v. Everything Yogurt, Inc.*, 819 F.Supp. 240 (E.D.N.Y.1993) ...............................20

28

*In re Sunrise Securities Litigation*, 793 F.Supp. 1306 (E.D.Pa.1992) .................................20

FEDERAL CASES (cont.)

*Neubronner v. Milken*, 6 F.3d 666 (9th Cir.1993)................................................................23

*Olsen v. Provident Life & Acc. Ins. Co.*, 1998 WL 410888 (N.D.Cal.1998)........................23

*O'Shea v. Amoco Oil Co.*, 886 F.2d 584 (3d Cir.1989) ....................................................6, 9

*Pride v. Exxon Corp.*, 911 F.2d 251 (9th Cir.1990) ........................................................8, 9

*S.E.C. v. Nacchio*, 438 F.Supp.2d 1266 (D.Colo.2006) ..............................................20, 21

*Seckler v. Star Enterprise*, 124 F.3d 1399 (11th Cir. 1997)..................................................9

*Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849 (11th Cir. 1997) ..................................8

*Simmons v. Mobil Oil Corp.* 29 F.3d 505 (9th Cir. 1994)..........................................6, 7, 9

*Unocal Corporation v. Kaabipour*, 177 F.3d 755 (9th Cir. 1999)..........................................6

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ..........................................19


CALIFORNIA CASES

*Alling v. Universal Manufacturing Corp*, 5 Cal. App. 4th 1412 (1992).................................12

*Bank of America Nat'l Trust & Sav. Ass'n v. Lamb Finance Co.*, 179 Cal. App. 2d 498 (1960) ...........13

*Bank of Beverly Hills,* 128 Cal. App. 3d 28 (1982)...............................................................15

*Butler v. The Vons Companies, Inc.*, 140 Cal. App. 4th 943 (2006) ......................................12

*California Svc. Stn. & Automotive Repair Assn. v. Union Oil Co.*, 232 Cal. App. 3d 44 (1991) ......6, 10

*City of Ukiah v. Fones*, 62 Cal.2d 104 (1968) ...........................................................11, 12

*Cohen v. Five Brooks Stable*, 159 Cal. App. 4th 1476 (2008) ...............................................12

*Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388 (1989).......................13

*Earhart v. William Low Co.*, 25 Cal.3d 503 (1979) ...........................................................19

*Employers Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906 (2008) ....................................15

*Forty-Niner Truck Plaza, Inc. v. Union Oil Co.*, 58 Cal. App. 4th 1261 (1997)...........................6, 9, 10

*Gafcon, Inc. v. Ponsor & Assoc.* (2002) 98 Cal. App. 4th 1388 ........................................24, 25

*Hackethal v. National Casualty Co.*, 189 Cal. App. 3d 1102 (1987)...............................22, 23

*Hastings v. Matlock*, 171 Cal. App. 3d 826 (1985). .........................................................18

*Hayter Trucking, Inc. v. Shell Western E&P, Inc.*, 18 Cal. App. 4th 1 (1993).....................................14

CALIFORNIA CASES (cont.)

*Hess v. Ford Motor Co.*, 27 Cal.4th 516 (2002)................................................................14

*Jones v. First American Title Ins. Co.*, 107 Cal. App. 4th 381 (2003).................................16

*Lund v. Bally's Aerobic Plus, Inc.*, 78 Cal. App. 4th 733 (2000).......................................12

*McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784 (2008) ........................................20

*Monarco v. Lo Greco*, 35 Cal.2d 621 (1950) ...................................................................18

*Pacific State Bank v. Greene*, 110 Cal. App. 4th 375 (2003)........................................13, 16

*Phillippe v. Shapell Industries*, 43 Cal.3d 1247 (1987)...................................................18

*Pistone v. Superior Court*, 228 Cal. App. 3d 672 (1991) .................................................13

*Post v. Palpar, Inc.*, 184 Cal. App. 2d 676 (1960) .........................................................15

*Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal. App. 3d 1154 (1984) ............16

*Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.,* 32 Cal. App. 4th 985 (1995)........13

*Skone v. Quanco Farms*, 261 Cal. App. 2d 237 (1968).....................................................14

*Sterling v. Taylor*, 40 Cal.4th 757 (2007)......................................................................18

*Sweat v. Big Time Auto Racing, Inc.*, 117 Cal. App. 4th 1301 (2004) ...............................12

*Tenzer v. Superscope, Inc.*, 39 Cal.3d 18 (1985). ...........................................................18

*Union Oil Co. v. O'Riley* (1990) 226 Cal. App. 3d 199 .....................................................6

*Walter E. Heller Western v. Tecrim Corp.*, 196 Cal. App. 3d 149 (1987) ..........................13

*Wilk v. Vencill*, 30 Cal.2d 104 (1947)...........................................................................18

*Wolf v. Superior Court*, 114 Cal. App. 4th 1343 (2004) ..............................................13, 14

*Wright v. Title Ins. & Trust Co.*, 274 Cal.App.2d 252 (1969)...........................................15


NON-CALIFORNIA CASE

*Amoco Oil Company v. Ervin*, 908 P.2d 493 (Colo. 1996) ...........................................10, 11

1    I.    **INTRODUCTION & STATEMENT OF ISSUES TO BE DECIDED**

2         Plaintiffs Charles Davidson & his family-owned company, CD & PWS Enterprises, Inc.

3    ("Plaintiffs") have sued Defendant ConocoPhillips Company ("Defendant") for breach of contract,

4    misrepresentation, and unfair business practices.   This case arises out of the parties' business

5    relationship as franchisee and franchisor of a Union 76 service station in Contra Costa County (San

6    Ramon) and one in Alameda County (Pleasanton). Defendant has filed a motion to dismiss, to which

7    this opposition responds.

8    II.    **STATEMENT OF FACTS**

9         A.    **The Parties Start With A Strong Business Relationship**

10        From 2001 to 2007, Plaintiffs operated a Union 76 service station in San Ramon, California as

11   a franchisee of Defendant or its predecessors. The parties' franchise relationship was principally

12   governed by a "Dealer Station Lease and Motor Fuel Agreement" ("Franchise Agreement"). The first

13   of these was executed by Plaintiffs' predecessor on January 20, 2001; the second was executed by

14   Plaintiffs on October 2, 2003; the third and final one was executed by Plaintiffs on November 6, 2006.

15   These Franchise Agreements were standard contracts between an oil company/franchisor and a gas

16   station owner/franchisee, providing the rental terms for the property as well as a wide variety of rights

17   and obligations regarding the station's appearance and maintenance, as well as the sale of fuel.

18   During the first few years of this business relationship, Plaintiffs' business prospered.

19        B.    **Defendant Offers An Expansion Opportunity, Which Plaintiffs Accept,**
              **Allowing For The Successful Remodeling Of The Station's Snack Shop**

20

21        In 2002, Defendant informed Plaintiffs about a rental reimbursement program which allowed

22   franchisees to make improvements to their stations in exchange for a rent waiver over a number of

23   years. Plaintiffs took advantage of the rental reimbursement program and remodeled the snack shop at

24   the San Ramon station. This remodeling cost approximately $41,000, which was reimbursed to

25   Plaintiffs over a number of years in the form of a $400 deduction in the monthly rental rate. The snack

26   shop remodel occurred over most of the calendar year 2002 and was completed in late 2002. Plaintiffs

27   did not provide any receipts to, or request reimbursement from, Defendant until after the project was

28   completed, pursuant to instructions by David Vann, Defendant's representative. The parties did not

1  execute any written agreement concerning the snack shop remodel until April 18, 2003—

2  approximately six months after it was completed.  However, Plaintiffs began receiving the promised

3  rent rebates well before that.  In other words, the parties both fully performed under the verbal

4  agreement before there was any memorialization of that agreement.

### C. Defendant Offers Another Expansion Opportunity, Which Plaintiffs Accept, Leading To The Successful Installation Of A Car Wash

#### 1. Plaintiff Accepts Defendant's Offer Letter

8      In January 2003, Plaintiffs received another letter from Defendant, discussing a new rental

9  reimbursement program regarding the improvement of service bays. This letter proposed rental rebate

10  terms that mirrored the previous convenience store reimbursement program.  Plaintiffs decided to take

11  advantage of this program as well, to build a car wash in one of the station's service bays. Plaintiffs

12  met with Defendant's agents, David Vann and David Scarlet, on July 1, 2003 to discuss the possible

13  car wash. On July 24, 2003, Plaintiffs wrote a letter to David Scarlet, Defendant's agent, copying

14  David Vann, to formally announce Plaintiffs' intention to convert a service bay into a car wash,

15  pursuant to the new reimbursement program. This letter included a paragraph explaining that Plaintiffs

16  were expecting to receive rental reimbursement for the costs of the car wash installation.  On July 25,

17  2003, Defendant sent a response to Plaintiffs, approving a "car wash – roll over style" at the San

18  Ramon station.   There was absolutely no indication in this letter that rent reimbursement was

19  unavailable to Plaintiffs or that Plaintiffs were mistaken in their understanding that they were eligible

20  for the rent reimbursement. At no point before Plaintiffs commenced preliminary planning and work

21  on the car wash project did Defendant give any indication that Plaintiffs would not be reimbursed, as

22  agreed, and as had occurred with the snack shop.

#### 2. Plaintiffs Spend Two Years And Tens Of Thousands Of Dollars To Plan For The Car Wash And Obtain Municipal Approval

25      Plaintiffs spent the next two years working to get municipal approval for the car wash.

26  Initially, the City of San Ramon denied the use permit application because of community concern, so

27  Plaintiffs redoubled their efforts and appealed the denial. Plaintiffs spent a large sum of money to

28  retain an architect, sound engineer and civil engineer to ensure that the car wash would have minimal

1  negative impact on the surrounding community. Plaintiffs kept Defendant's agents, David Vann and

2  Greg Pellegrino, updated throughout this time and frequently copied them on relevant correspondence,

3  sent them emails with status updates, and spoke with them on the telephone. Plaintiffs ultimately

4  prevailed in January 2006 when the City of San Ramon approved the use permit for the car wash. By

5  this point in the project, Plaintiffs had spent more than $275,000 getting the car wash approved and

6  had made significant steps towards acquiring $180,000 of equipment for the car wash. In total,

7  Plaintiffs had taken on a $455,000 project to improve Defendant's property.

### 3. Defendant Helps Plaintiffs Obtain A Loan, Which Plaintiffs Cannot Get On Their Own Because Defendant Owns The Land On Which The Car Wash Will Be Constructed

10  In early 2006, Plaintiffs needed a loan to afford the car wash, so they sought financing with a

11  number of banks. But these banks refused to loan Plaintiffs money since Defendant, not Plaintiffs,

12  owned the land where the car wash would be constructed. Plaintiffs explained this dilemma to Greg

13  Pellegrino, who referred Plaintiffs to U.S. Energy Capital Bank, a bank with which Defendant

14  apparently had a prior relationship.  Plaintiffs applied for a loan with that bank and made it clear in

15  their application that they had been promised rental reimbursement from Defendant for the cost of the

16  car wash project. U.S. Energy Capital Bank approved Plaintiffs' request for a $250,000 loan on or

17  about February 16, 2006 and disbursed the funds soon thereafter.

### 4. As The First Loan Payment Becomes Due, Plaintiffs Approach Defendant About The Reimbursement Plan—And Are Hit With A Bombshell

20  Plaintiffs met with Mr. Pellegrino in or around March 2006 at the Big Horn Steakhouse in San

21  Ramon, California to discuss rent reimbursement for the car wash costs.  For the first time in three

22  years, Defendant, through Mr. Pellegrino, began to hedge on whether it would reimburse Plaintiffs as

23  agreed.  For example, Mr. Pellegrino stated that he would "think about it". On April 18, 2006,

24  Plaintiffs sent an email to Mr. Vann, informing him of the upcoming first payment on the loan,

25  scheduled for May 15, 2006, and requested prompt rent reimbursement from Defendant.  Plaintiffs

26  stated that if the rent rebate was not forthcoming very soon, there would be "irreparable harm."  On

27  June 14, 2006, Mr. Pellegrino sent a letter to Plaintiffs stating: "we do not currently have a program to

28  offer assistance to dealers for making investments at their sites," effectively denying Plaintiffs any

rental reimbursement for their investment. After Mr. Pellegrino's June 14, 2006 letter, Plaintiffs
sought clarification of the rental reimbursement issue with Bill Brasher, Defendant's agent. Mr.
Brasher sent Plaintiffs an email on September 26, 2006 stating that "economic incentive programs
previously promoted by Defendant and its predecessors are not available at this time." Apparently, all
of Defendant's reimbursement programs were cancelled, yet Plaintiffs were never informed of this.

**5.    Plaintiffs Are Forced To Complete The Car Wash Installation Project**

Since the equipment had been purchased, Plaintiffs installed the car wash, which operated
from December 2006 to October 2007. This was necessary to mitigate damages, in that the car wash
was expected to increase fuel sales by 5-8% and would significantly increase the value of the station.

**6.    In Token Response To Plaintiffs' Complaints, Defendant Makes A Bad-Faith
Offer, Which It Knows Plaintiffs Cannot Accept**

In April 2007, Plaintiffs filed an ethics complaint with Defendant against Mr. Brasher, Mr.
Vann and Mr. Pellegrino.  A few months later, on July 24, 2007, Defendant proposed a rent rebate
agreement that would have reimbursed Plaintiffs only a portion of the money spent. Plaintiffs
immediately asked why Defendant was offering only $275,000 instead of the total cost of $455,000.
Defendant responded that the reimbursement would not cover the cost of "removable equipment",
which according to Defendant, included most of the car wash equipment that Plaintiffs had ordered
and installed. Plaintiffs refused to sign this agreement since it left $180,000 uncompensated.

**7.    As A Direct Result Of Defendant's Unfair Business Practices, Plaintiffs'
Financial Condition Begins To Falter And They Lose Their Other Station**

Plaintiffs could not withstand the burden of paying the bank loan in addition to their usual
expenses without rental reimbursement. Since Defendant refused to reimburse Plaintiffs, Plaintiffs
were initially forced, in the summer of 2007, to sell gas at a loss in order to make timely payments.
This tactic proved to be futile and Plaintiffs missed a number of gasoline payments and loan
payments.  Prior to the summer of 2007, Plaintiffs had good credit.  However, in 2007, their mounting
financial burden severely damaged Plaintiffs' credit.

As time passed and the financial burdens became worse, Plaintiffs were forced to sell their
other gas station. (In 2003, they had purchased another Union 76 gas station in Pleasanton, California,

1    known as "Pleasanton 76.") However, during negotiations, the buyer lowered his offer by $160,000

2    because Plaintiffs had recently sold gas at the station for a loss, which allegedly decreased the value of

3    the business. Although the station was making record profits in 2007, Plaintiffs had to agree to this

4    lower price because of their desperate financial situation and to mitigate their damages.

5    **8.    Plaintiffs Lose The San Ramon Station And Everything They Had Invested In It**

6    Due to Defendant's refusal to provide the promised reimbursement, the San Ramon station

7    was operating at a significant loss. Plaintiffs were not able to absorb this loss and therefore tried to

8    sell the business, which was worth many hundreds of thousands of dollars. As Plaintiffs teetered on

9    the brink of personal and corporate financial ruin, Defendant twisted the knife. Because of Plaintiffs'

10   poor credit and marginal financial capacity—brought about entirely by Defendant's actions—

11   Plaintiffs bounced a check to Defendant for fuel. Although Plaintiffs made good on the check,

12   Defendant placed Plaintiffs on cash-advance status, meaning they had to pay for all fuel in advance.

13   This was often $20,000 to $30,000 per fuel drop. Since Plaintiffs were now "robbing Peter to pay

14   Paul," they simply could not make such large advance payments. Plaintiffs pleaded with Defendant to

15   permit Plaintiffs to remain on a credit account, but Defendant coldly refused. This was the final straw.

16   Plaintiffs could not afford to buy the fuel in cash and therefore did not have enough fuel to sell. True

17   to form, Defendant then accused Plaintiffs of breaching the Franchise Agreement by not continuously

18   selling fuel and ordered Plaintiffs to vacate the premises! Defendant then took control of the station,

19   including the car wash, which Defendant had refused to pay for. Plaintiffs had to walk away from a

20   business in which they had invested over $1 million. Through its bad faith treatment of Plaintiffs,

21   culminating in an eviction, Defendant was unjustly enriched in the value of the business and car wash.

22   **9.    Mr. & Mrs. Davidson Face A Total Financial Collapse**

23   To make ends meet, Mr. and Mrs. Davidson were forced to sell their car, the family home in

24   Alamo and their rental property in Danville at a combined loss of more than $100,000. In addition to

25   these immediate losses, the Davidsons' real estate losses continue to increase in that they are no longer

26   able to enjoy the appreciation on those properties. Mr. & Mrs. Davidson were forced to move into an

27   extended-stay hotel with their cats. For months, the Davidsons were turned away from rental housing

28   and denied employment because of their poor credit. Eventually, Mr. & Mrs. Davidson had to leave

1   the Bay Area and move to Maryland, where their daughters live. They finally obtained a modest
2   apartment, but only on condition that Mr. Davidson's sister co-sign the rental agreement. Mr.
3   Davidson recently landed a modest job, but at a fraction of the income he was earning through his
4   business. *As a result of Defendant's breach of contract, concealment, and other sharp practices,*
5   *Plaintiffs are expected to ultimately suffer damages in the range of $3 million.*

6   **III.     LEGAL ARGUMENT**

7   **A.     The PMPA Does Not Preempt Any Of Plaintiffs Claims**

8          **1.     The PMPA's Preemptive Scope Is Limited**

9          The primary purpose of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.*
10   ("PMPA") is to provide a uniform body of law and to protect "franchisees from arbitrary or
11   discriminatory termination or non-renewal of their franchises." *Simmons v. Mobil Oil Corp.* 29 F.3d
12   505, 509 (9th Cir. 1994). By its express language, the statute preempts only those state laws that apply
13   to franchise terminations or nonrenewals. *See Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 305 (2d
14   Cir.1986); *see also Simmons*, 29 F.3d at 512; *California Service Station & Automotive Repair Assn. v.*
15   *Union Oil Co.*, 232 Cal. App. 3d 44, 51, 52 (1991). The framers of the PMPA intended "to create a
16   uniform system of franchise termination, not a uniform system of contract law." *O'Shea v. Amoco Oil*
17   *Co.*, 886 F.2d 584, 593 (3d Cir.1989). "The preemptive scope of the PMPA is limited; it does not
18   reach any state laws which only incidentally affect franchise termination or nonrenewal." *Unocal*
19   *Corporation v. Kaabipour*, 177 F.3d 755, 768 (9th Cir. 1999). "State and federal laws should be
20   accommodated and harmonized where possible so that preemption can be avoided." *Unocal*
21   *Corporation*, 177 F.3d at 769; *Forty-Niner Truck Plaza, Inc. v. Union Oil Co.*, 58 Cal. App. 4th 1261,
22   1276 (1997)[1] There is a strong presumption against finding that state law is preempted by federal law.
23   *See Committee of Dental Amalgam Mfrs. v. Stratton*, 92 F.3d 807, 811 (9th Cir 1996).

24
25
26

27   [1]   California's state courts have concurrent jurisdiction over the PMPA. *See Union Oil Co. v. O'Riley* (1990)
28   226 Cal.App.3d 199, 204 (*relying on reasoning in Tafflin v. Levitt* (1990) 493 U.S. 455). Therefore, their
     decisions interpreting the scope of the PMPA, and the question of preemption, are persuasive authority.

2. **The PMPA Does Not Preempt Plaintiffs Claims Because Plaintiffs Are Suing For Breach Of An Independent Contract And Defendant's Tortious Conduct, Not For Termination Of The Franchise Agreement**

Plaintiffs allege that Defendant: (1) breached a contract to waive rent in exchange for Plaintiffs making substantial improvements to Defendant's property (Compl., ¶¶ 18-20); (2) concealed and/or affirmatively misrepresented the availability of the rent reimbursement program (Compl., ¶¶ 26-28, 32-34); and (3) engaged in unfair business practices by the aforementioned actions and through suspected similar activities toward other station operators (Compl., ¶¶ 36, 39-40.) None of these allegations are based on the termination of the franchise relationship. Rather, all of Plaintiffs' claims seek relief for contractual breaches or tortious conduct that occurred independently of the franchise termination. It so happens that, because of the level of damages, Plaintiffs were driven out of business and essentially bankrupted. However, the fact that the franchise was ultimately terminated is only incidental to Plaintiffs' claims. If Plaintiffs had $10 million in savings, they could have withstood the financial disaster that Defendant brought about. In that case, they would not have been forced out of business, but could continue to run the station at a loss until such time as they recovered their past and future losses through litigation. Yet Plaintiffs still would have sued, under these very same legal theories. Thus, the franchise termination was unfortunate, and indicates how high Plaintiffs damages are, but is not a primary issue in this case. And the state laws on which Plaintiffs rely have nothing to do with franchise termination. Certainly Defendant cannot be permitted to use the extent of the damage it caused to support a preemption defense.

Defendant cites many cases for broad propositions, but none that find preemption where the plaintiff was not challenging the franchisor's decision to terminate or not renew the franchise. Defendant's cases also do not support Defendant's contention that Plaintiffs' claims should be dismissed on a Rule 12(b)(6) motion, before there has been any opportunity for discovery.

At least one of Defendant's cases, *Simmons v. Mobil Oil Corporation*, 29 F.3d 505 (9th Cir. 1994) actually makes Plaintiffs' point. In *Simmons*, a gas station franchisee sued Mobil Oil for a variety of claims relating to the termination of the franchise. Among these claims were breach of the covenant of good faith and fair dealing and fraud. The Ninth Circuit held that these claims were not preempted to the extent that they sought relief for Mobil's conduct distinct from its termination or

1  non-renewal of the franchise. *See Simmons*, 29 F.3d at 512. "The fact that Simmons himself
2  eventually terminated the franchise does not preclude him from bringing a claim based on Mobil's
3  alleged breach of the covenant of good faith." *Id.*

4      Another of Defendant's cases, *Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849 (11th Cir.
5  1997) is distinguishable on its facts. In *Shukla*, the franchisee sued BP Oil for violation of the PMPA
6  and fraud. The franchisee's claims arose from the fact that BP Oil sold the subject station to another
7  company, which later refused to renew the franchise agreement. *Shukla*, 115 F.3d at 854-55. In other
8  words, the essential complaint was that the franchise was improperly terminated. As the Eleventh
9  Circuit observed, the fraud claim was preempted because "BP's alleged failure to disclose is material
10  only because the new franchisor, Petro, refused to renew Shukla's franchise." *Id.* at 855. Here, on the
11  other hand, Plaintiffs' claims arise from facts entirely unrelated to the termination of the franchise.

12      A third case of Defendant's, *Arbabian v. BP America,* 898 F.Supp. 703 (N.D.Cal.1995) is also
13  distinguishable. The thrust of the argument in *Arbabian* is that allowing the plaintiff to pursue state
14  law contract and tort claims against the franchisor would have penalized the franchisor for failing to
15  do something that the PMPA did not require and, essentially, would have created a new state rule that
16  contradicted the PMPA. Here, on the other hand, the state law claims are garden variety contract and
17  tort claims based on state laws that do nothing to change the effect of the PMPA.

18      A survey of federal and state cases demonstrates the simple proposition that there is no PMPA
19  preemption unless the state law claims <u>directly relate</u> to the franchise termination. For example:

20      **a.    *Pride v. Exxon Corp.*, 911 F.2d 251 (9th Cir.1990)**

21      In *Pride*, the franchisee alleged that his agreement with Exxon was void because, prior to the
22  signing of the agreement, "Exxon failed to disclose all the matters material to the consideration of the
23  purchase." *Pride v. Exxon Corp.*, 911 F.2d 251, 257 (9th Cir. 1990). Exxon sold its area stations,
24  including the franchisee's, to Texaco, and the franchisee entered into a new franchise agreement with
25  Texaco. The franchisee alleged that Exxon had fraudulently induced him to enter into his initial
26  franchise agreement by misrepresenting its intention to withdraw from the market. The Ninth Circuit
27  concluded that the franchisee's fraud claim was not preempted because it was not based upon a
28

1  termination or non-renewal, but upon alleged nondisclosures that occurred prior to the execution of

2  the franchise agreement. *See id.* at 257-58.

3      Similarly, Plaintiffs' claims are not based on the termination of the franchise, but on

4  misrepresentations concerning Defendant's willingness to reimburse Plaintiffs for installing a car

5  wash on Defendant's property (which in turn constituted concealment in connection with the 2003 and

6  2007 Franchise Agreements).[2]  As the Ninth Circuit reasoned, citing *O'Shea v. Amoco Oil Co.*, 886

7  F.2d 584 (3d Cir.1989), "[the PMPA] "only preempts state laws that limit the permissible substantive

8  reasons that a petroleum franchisor can terminate a franchisee. <u>It thus would not preempt the general</u>

9  <u>common law rule that contracts entered into by fraud are unenforceable.</u>" *Id.* at 592-93.

10      **b.**     ***Seckler v. Star Enterprise*, 124 F.3d 1399 (11th Cir. 1997)**

11      In *Seckler*, the plaintiff sued the franchisor for breach of contract, promissory estoppel, fraud,

12  negligent misrepresentation and infliction of emotional distress.  The plaintiff's relevant claims grew

13  out of the fact that the franchisor had promised to sell plaintiff the service station, but then reneged

14  after the plaintiff sold his home in order to raise the money to purchase the station. Reversing the trial

15  court's order granting summary judgment, the *Seckler* court concluded that allowing the plaintiff's

16  claims to proceed would not interfere with the PMPA or its purposes:

17      If Seckler is successful with his fraud and misrepresentation claims, Star will not be
    penalized for failing to follow procedures different from those in the PMPA. It will

18      not be penalized for rescinding its offer, which the PMPA allows. If Seckler is
    successful, Star will be penalized for sending him false notices of non-renewal,

19      something the PMPA does not permit and was not written to protect. Allowing these
    claims to proceed will not result in any state law inconsistent with the requirements

20      of the PMPA and the uniformity of the federal law will not be destroyed.

21  *Seckler v. Star Enterprise*, 124 F.3d 1399, 1404-06 (11th Cir. 1997). As the Eleventh Court explained,

22  "The PMPA was not written to allow petroleum franchisors to hide behind the preemption provision

23  

24  _____

[2] Some of the language in the *Pride* opinion focuses on relevance of the timing of the alleged

25  misrepresentations, observing that misrepresentations made before the agreement was executed could not be
based on the termination of the agreement. While this is true, the timing is not the determinative issue.

26  Instead, the question is whether the franchisee complains that the termination itself was improper or that the
franchisor engaged in some independent malfeasance or nonfeasance. *See, e.g., Simmons*, 29 F.3d at 512

27  (holding fraud claims arising <u>after</u> execution of the franchise renewal agreement were actionable); *Amoco Oil
Company v. Ervin*, 908 P.2d 493 (Co. 1996) (finding no preemption of good faith claims that related to

28  conduct occurring <u>during</u> the term of the franchise agreement).

1   to avoid tort, contract or fraud suits brought by franchisees with regard to actions that do not constitute

2   termination or non-renewal of a franchise or notification of such action." *Id.* at 1406.

3          **c.**    ***Forty-Niner Truck Plaza, Inc. v. Union Oil Co.*, 58 Cal. App. 4th 1261 (1997).**

4         In *Forty-Niner*, Union Oil Company, sold truck stop properties it had leased to franchisees to

5   a third party, but assigned the franchise agreements to that third party rather than terminate them. The

6   plaintiffs sued for, *inter alia*, violation of Business & Professions Code Section 20999.25(a), which

7   requires franchisors to give franchisees a right of first refusal before selling, transferring or assigning

8   the property to a third party. In a multi-million dollar verdict, including punitive damages, the jury

9   found in the plaintiffs' favor. *See Forty-Niner*, 58 Cal. App. 4th at 1266. The court of appeal rejected

10  Union Oil's preemption argument on the ground that "the PMPA and section 20999.25(a) occupy

11  different spheres outside the context of franchise termination or nonrenewal." *Id.* at 1276.

12         **d.**    ***California Service Station & Automotive Repair Assoc. v. Union Oil Company***
13               ***of California*, 232 Cal. App. 3d 44 (1991)**

14        In *California Service Station*, an association of station owners alleged Union Oil's policy

15  governing the sale of franchises violated Business & Professions Code Section 21148(a), which limits

16  the circumstances under which a franchisor may withhold consent to such sales. As with the case at

17  bar, the plaintiffs in *California Service Station* also asserted a Section 17200 claim. The trial court

18  granted the injunction. The court of appeal held that Section 21148(a) was not preempted and affirmed

19  the injunctive relief under the Section 17200 claim. *California Service Station*, 232 Cal. App. 3d at

20  283-86. The court reasoned: "On its face section 21148, subdivision (a)(3), concerns the permissible

21  grounds by which a franchisor may withhold consent to a franchise. It does not concern the

22  termination or nonrenewal of a franchise or notice with respect thereto." *Id.* at 283.

23         **e.**    ***Amoco Oil Company v. Ervin*, 908 P.2d 493 (Colo. 1996)**

24        In *Amoco*, the Colorado Supreme Court considered the question of whether the PMPA's

25  preemption provision precluded a franchisor from suing for breach of the covenant of good faith and

26  fair dealing. After surveying state and federal law on the subject, the court determined that the tort

27  claim was not preempted, reasoning:

28

1
2
3
4

> The dealers' claims are not preempted in the present case because they do not implicate Amoco's termination or nonrenewal of the franchises. The dealers challenge substantive provisions of the contracts and Amoco's pricing conduct, which occurred during the term of the contracts. Allowing the dealers to pursue their state law claims does not create substantive rights that would not exist under the PMPA. [¶] The statutory language and the presumption against preemption prevent us from finding a state-federal conflict because of a fortuitous and attenuated application of the PMPA.

5   *Amoco Oil Company v. Ervin*, 908 P.2d 493, 504 (Co. 1996) (citations and quotations omitted).

6   Here, Plaintiffs' run-of-the-mill state claims seek relief for Defendant's breach of an

7   independent contract and tortious conduct totally unrelated to the termination of the franchise.

8   Defendant argues that the eventual collapse of Plaintiffs' business somehow shows that the claims are

9   "intimately intertwined" with the termination or nonrenewal. (Df.'s Opening Br. at 6:26-7:20.)  The

10  fact that Defendant's conduct was so egregious, and led to so much damage to Plaintiffs, does not

11  mean that the claims are preempted.  Rather, the level of damage is just another reason that equities

12  and a fair reading of the PMPA compel a finding of no preemption.  *See Amoco*, 908 P.2d at 504 (the

13  fact that the franchisor's practices had an attenuated affect on the dealers' ability to remain viable

14  business entities did not mean they directly impacted the termination or nonrenewal of the franchises.)

15  **B.    The Parol Evidence Rule Does Not Bar Plaintiffs' Contract Claim**

16        **1.    Plaintiffs Are Not Seeking To Introduce Extraneous Evidence To Interpret The
17            2007 Franchise Agreement, But Merely To Assert Their Rights Under A Separate
          Contract Altogether**

18  The parol evidence argument fails from the outset because Plaintiffs are not seeking to

19  introduce parol evidence to explain or contradict the terms of the 2007 Franchise Agreement.  Instead,

20  Plaintiffs are merely asserting a claim for breach of a different contract altogether.

21  Defendant's position, stripped of its adornments, is that by signing the form franchise contract

22  in 2007 (which they had to do or they would immediately lose their franchise), Plaintiffs also

23  inadvertently released Defendant from all other obligations that Defendant had—including the right to

24  be reimbursed for $455,000 of improvements that Plaintiffs made to Defendant's property.  Such a

25  position cannot, for any number of reasons, be accepted by a court of equity.

26  First, it is a bedrock principle of contract law that a release requires a "meeting of the minds."

27  *See* Cal. Civ. Code §§ 1550, 1580. A release is not enforceable if it is based on mistake. *See* Cal. Civ.

28  Code §§ 1568, 1577, 1578. "The burden, moreover, is on the party claiming a waiver of a right to

1  prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful

2  cases will be decided against a waiver." *City of Ukiah v. Fones*, 62 Cal.2d 104, 107-08 (1968). Here,

3  there was no "meeting of the minds" because Defendant evidently thought that Plaintiffs were waiving

4  their right to reimbursement and Plaintiffs thought they were merely renewing their Franchise

5  Agreement. In other words, the parties walked away with fundamentally different understandings

6  about the scope of the 2007 Franchise Agreement.

7      Second, "[w]aiver always rests up intent. Waiver is the relinquishment of a known right after

8  knowledge of the facts." *City of Ukiah*, 64 Cal.2d at 107. "In order for a release of liability to be held

9  enforceable against a plaintiff, it must be clear, unambiguous and explicit in expressing the intent of

10  the parties." *Sweat v. Big Time Auto Racing, Inc.*, 117 Cal. App. 4th 1301, 1305 (2004). Here, there is

11  no way Plaintiffs (unrepresented by counsel and unsophisticated compared to an oil company) would

12  have possibly known that by signing the form franchise renewal, they would also waive their rights to

13  reimbursement of $455,000. To the contrary, Plaintiffs had already made it very clear to Defendant

14  that they needed to be reimbursed or would be destroyed financially.

15      Third, it is well settled that "the scope of a waiver of unknown claims is a question of fact."

16  *Butler v. The Vons Companies, Inc.*, 140 Cal. App. 4th 943, 950 (2006). Therefore, to the extent that

17  Defendant argues Plaintiffs waived their right to reimbursement, a jury will have to decide this issue.

18  And, because Defendant drafted the purported "release," ambiguities will be resolved in Plaintiffs'

19  favor.  *See* Cal. Civ. Code § 1654; *Cohen v. Five Brooks Stable*, 159 Cal. App. 4th 1476, 1486

20  (2008); *Lund v. Bally's Aerobic Plus, Inc.*, 78 Cal. App. 4th 733, 738 (2000).

21      **2.    The Parol Evidence Rule Does Not Apply Because The 2007 Franchise**
            **Agreement Was Not Fully Integrated**

22

23      Despite the sweeping language in the Franchise Agreement, it was not fully integrated insofar

24  as the issue of reimbursement for the car wash. First and foremost, the Franchise Agreement is silent

25  on the car wash program, whether it affects the rent, who owns the equipment, and other issues central

26  to the rent reimbursement program.  Accordingly, it is entirely unreasonable to conclude that the

27  parties intended to cover that topic and the Court should determine that the absence of that significant

28  topic means that the agreement was not fully integrated.

1    Second, California has expressly rejected the "face of the document" test for integration and

2  allows the introduction of "evidence of surrounding circumstances and prior negotiations" for the

3  limited purpose of determining whether the contract "was intended to be the final agreement of the

4  parties superseding all other transactions." *Alling v. Universal Manufacturing Corp*, 5 Cal. App. 4th

5  1412, 1434 (1992) (*citing Masterson v. Sine*, 68 Cal.2d 222, 226 (1968)). Therefore, even to determine

6  the issue of integration, the Court will have to look beyond the four corners of the agreement. *See* Cal.

7  Code Civ. Proc. §§ 1856, 1856(b).

8    **3.    Even If The 2007 Franchise Agreement Had Been Fully Integrated, The Parole Evidence Rule Would Not Prevent Plaintiffs From Offering Certain**
9    **Evidence To Challenge Defendant's Interpretation Of The Agreement**

10    **a.    Parol Evidence Is Permitted To Challenge The Validity Of The Contract**

11    The parol evidence rule does not prevent a party from introducing evidence showing the party

12  was fraudulently induced to enter the agreement. *See* Cal. Code Civ. Proc. § 1856(f)-(g); *Pacific State*

13  *Bank v. Greene*, 110 Cal. App. 4th 375, 389 (2003).  A party cannot be allowed to insulate itself from

14  the consequences of its own fraud, merely be including an integration clause in a form contract.  *See*

15  *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Develop. Corp.,* 32 Cal. App. 4th 985, 991–993

16  (1995); *Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 416–424

17  (1989).  Further, parol evidence is admissible to prove that a party made an independent promise with

18  no intention of performing it. *Bank of America Nat'l Trust & Sav. Ass'n v. Lamb Finance Co.*, 179 Cal.

19  App. 2d 498, 502 (1960); *Continental Airlines*, 216 Cal. App. 3d at 419.

20    Here, Plaintiffs were told—and reasonably believed from prior dealings—that the car wash

21  agreement was independent from the periodic renewal of the franchise contract and therefore Plaintiffs

22  would be entitled to reimbursement.  If Defendant had no intention of reimbursing Plaintiffs, yet led

23  them to believe that this would occur, then Defendant committed fraud.  It would be contrary to public

24  policy to permit an oil company to insulate itself from that fraud by including an integration clause in

25  a routine renewal agreement (which in this instance was the product of duress).

26    **b.    Parol Evidence Is Permitted To Aid In The Interpretation Of Ambiguities**

27    Courts frequently accept parol evidence in order to resolve ambiguities, whether they are

28  latent or patent ambiguities. *See, e.g., Pistone v. Superior Court*, 228 Cal. App. 3d 672, 680 (1991)

1  (latent ambiguity); *Walter E. Heller Western v. Tecrim Corp.*, 196 Cal. App. 3d 149, 158 (1987)

2  (patent ambiguity); *see also* Cal. Code Civ. Proc. § 1856(g).  Even if a contract appears unambiguous

3  on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one

4  possible meaning to which the language of the contract is reasonably susceptible. *Wolf v. Superior*

5  *Court*, 114 Cal. App. 4th 1343, 1351 (2004).  "It is reversible error for a trial court to refuse to

6  consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of

7  the contract appears to be clear and unambiguous on its face." *Wolf*, 114 Cal. App. 4th at 1351.

8  ### c.    Parol Evidence Is Permitted To Correct Mistakes Or Omissions

9  If the parties make a mistake or omit something from a contract, the courts will accept parol

10  evidence to resolve the issue. *Hess v. Ford Motor Co.*, 27 Cal.4th 516, 525 (2002); Cal. Civ. Code §§

11  1640, 3399. "It is the rule that, where the writing itself, through mistake, does not express the intention

12  of the parties who entered into it ... and the writing does not therefore contain the real contract

13  between the parties, the objection as to parol evidence is without merit." *Hess*, 27 Cal.4th at 525.

14  "Extrinsic evidence is necessary because the court must divine the true intentions of the contracting

15  parties and determine whether the written agreement accurately represents those intentions. *Id.*

16  ### d.    Parol Evidence Is Permitted To Show A Consistent Collateral Agreement

17  In *Hayter Trucking, Inc. v. Shell Western E&P, Inc.*, 18 Cal. App. 4th 1 (1993), the court

18  discussed the evolution of the parol evidence rule under California law:

19   The traditional parol evidence rule allowed extrinsic evidence to give meaning to a
   writing only when the writing was ambiguous.  However, in 1968, the California
20  Supreme Court liberalized the traditional rule by rejecting the "plain meaning rule."
   Hence, extrinsic evidence relevant to interpretation can no longer be barred simply
21  because of a judicial determination that a writing appears to have only one
   interpretation. Parol evidence is now admissible to show mutually shared meanings of
22  words used irrespective of their ordinary meaning. Most importantly, parol evidence
   of custom and usage is similarly admissible to interpret the written words.
23

24  *Hayter*, 18 Cal. App. 4th at 20 (internal citations omitted).  "An integration may be partial as well as

25  complete. In other words, the parties may intend a writing to finally and completely express certain

26  terms of their agreement rather than the agreement in its entirety." *Id.* at 14.  "When only part of the

27  agreement is integrated, the parol evidence rule applies to that part. However, extrinsic evidence may

28

1    be used to prove elements of the agreement not reduced to writing." *Id*; *see also Skone v. Quanco*
2    *Farms*, 261 Cal. App. 2d 237, 243 (1968).

3          Pursuant to the foregoing authorities, the extrinsic evidence offered by Plaintiffs must be
4    accepted by the trial judge.  Therefore, on this motion, the Court should not dismiss Plaintiffs' claims
5    on the ground that the Franchise Agreement is susceptible only to the meaning argued by Defendant,
6    even if the Court agrees with that interpretation.  Several factors will weigh in favor of allowing this
7    extrinsic evidence, even if the agreement was considered integrated.  First, on its face, the agreement
8    does not address the substantial and complicated issues surrounding the car wash installation and
9    related reimbursement program.  And, because the agreement is silent on the car wash reimbursement
10   issue, there is no conflict between the oral contract argued by Plaintiffs and the 2007 Franchise
11   Agreement.  Therefore, the Franchise Agreement may be explained or supplemented by parol
12   evidence.  *See* Code of Civ. Proc. § 1856(b), *comment*; Cal. Com. Code § 2202(b); *Post v. Palpar,*
13   *Inc.*, 184 Cal. App. 2d 676, 681 (1960).

14         Second, the trial court may properly find that the oral agreement between the parties was a
15   separate contract from the Franchise Agreement and that the oral contract was not merged in the
16   Franchise Agreement.  *See, e.g., Wright v. Title Ins. & Trust Co.*, 274 Cal.App.2d 252 (1969).  The
17   most obvious evidence for this is the fact that Defendant had a practice of modifying the Franchise
18   Agreement after the franchisee completed the improvement.  In other words, first there is a Franchise
19   Agreement, then the franchisee makes the improvements, then Defendant generates a written
20   modification agreement.  <u>In the case of Plaintiffs' snack shop, the modification agreement was not</u>
21   <u>executed until more than six months after the work was done.</u>  *See* Df.'s Opening Br., Exh. D, p.9
22   (The modifications were accepted on October 1, 2002 but the parties did not execute the modification
23   agreement until April 18, 2003.)  While a very peculiar way for a major corporation to do business,
24   this past practice shows it was reasonable for Plaintiffs to assume that, once the car wash was done,
25   Defendant would "accept" the modifications and generate another contract specifically addressing the
26   car wash.  *See* e.g., *Bank of Beverly Hills*, 128 Cal. App. 3d 28, 37 (1982) (evidence showing the usual
27   practice within a particular industry is admissible to establish that an agreement would "naturally" be
28   made as a separate agreement).  The Court may consider this course of dealing or course of

performance in order to explain or supplement an agreement, even if it is integrated. *See* Cal. Code

Civ. Proc. § 1856(c); *Employers Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 920

(2008); *accord* Cal. Com. Code § 2202(a).

**4.    If Parol Evidence Is Not Allowed, The Franchise Agreement Must Be Reformed On The Grounds Of Mistake, Duress, And Unconscionability**

**a.    Reformation Based On Mistake**

California Civil Code Section 3399 provides: "When, through fraud or a mutual mistake of the

parties, or a mistake of one party, which the other at the time knew or suspected, a written contract

does not truly express the intention of the parties, it may be revised on the application of a party

aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired

by third persons, in good faith and for value." Cal. Civ. Code § 3399. "It is well settled that the

remedy of reformation is equitable in nature and not restricted to the exact situations stated in section

3399." *Jones v. First American Title Ins. Co.*, 107 Cal. App. 4th 381, 388 (2003). The Court should

not "view[] its powers of reformation too narrowly. The essential purpose of reformation is to reflect

the intent of the parties." *Jones*, 107 Cal. App. 4th at 388-89.

A mistake of fact is ground for reformation if: (1) the mistake occurred when the contract was

executed; (2) the mistake concerned a term that was essential to the contract; and (3) correction of the

mistake is material to the parties' rights. *Pacific State Bank*, 110 Cal. App. 4th at 388–389 (can

include mistake about nature of agreement); *Jones*, 107 Cal. App. 4th at 389 (mistake is an "ingredient

of reformation ... not its essence").

Defendant seems to contend that it believed the Franchise Agreement quietly acted to

extinguish Plaintiffs' right to be reimbursed for the $455,000 car wash. Plaintiffs, on the other hand,

plainly believed that the car wash agreement was distinct from the Franchise Agreement. Given these

diametrically opposed understandings about the nature and scope of the Franchise Agreement, it

should be reformed based on mistake.

**b.    Reformation Based On Duress**

Economic duress is "the wrongful exploitation of business exigencies to obtain

disproportionate exchanges of value." *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal.

1  App. 3d 1154, 1159 (1984). "As it has evolved to the present day, the economic duress doctrine is not

2  limited by early statutory and judicial expressions requiring an unlawful act in the nature of a tort or a

3  crime. Instead, the doctrine now may come into play upon the doing of a wrongful act which is

4  sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to

5  succumb to the perpetrator's pressure." *Id.* at 1158-59.

6      Here, Defendant apparently provided Plaintiffs, unrepresented by counsel, with a boilerplate

7  contract, which Plaintiffs had to sign or Defendant would close down the station. Under these

8  circumstances, Plaintiffs had no real choice but to sign the 2007 Franchise Agreement, almost

9  regardless of what it said. This is a classic case of duress. Therefore, the Franchise Agreement should

10  be reformed.

11                **c.    Reformation Based On Unconscionability**

12      California Civil Code Section 1670.5 provides:

13      (a)  If the court as a matter of law finds the contract or any clause of the contract to
           have been unconscionable at the time it was made the court may refuse to
14           enforce the contract, or it may enforce the remainder of the contract without the
           unconscionable clause, or it may so limit the application of any unconscionable
15           clause as to avoid any unconscionable result.

16      (b)  When it is claimed or appears to the court that the contract or any clause thereof
           may be unconscionable the parties shall be afforded a reasonable opportunity to
17           present evidence as to its commercial setting, purpose, and effect to aid the court
           in making the determination.

18

19      Paragraph ¶ 49(a)(3) of the Franchise Agreement purports to cancel and supersede "Any and

20  all of the relationship which exists between ConocoPhillips and Dealer." This clause, read as

21  Defendant suggests, would lead to absurd and unconscionable results. As specifically argued by

22  Defendant, Plaintiffs allegedly waived hundreds of thousands of dollars in reimbursement without

23  knowing it and without even being presented with any document that resembled a release or waiver of

24  rights. No further discussion is needed to demonstrate the outrageousness of such a claim.

25      Although the remedy of reformation is not presently before the Court, if Defendant's

26  interpretation of the Franchise Agreement is accepted, then that agreement was the product of mistake,

27  duress and unconscionability. The Court should not dismiss any of Plaintiffs' claims until at least

28  such time as the Court has passed on these issues.

C.    **The Statute Of Frauds Does Not Bar Plaintiffs' Claim**

The California Supreme Court recently examined the history of the statute of frauds in California, including some of the overreaching language in many judicial opinions. This state's high court summarized the purpose of the statute and explained what the statute was not intended to do:

> To clarify the law on this point, we disapprove the statements in California cases barring consideration of extrinsic evidence to determine the sufficiency of a memorandum under the statute of frauds. The purposes of the statute are not served by such a rigid rule, which has never been a consistent feature of the common law.
>
> \*    \*    \*
>
> The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made. In brief, the Statute was intended to guard against the perils of perjury and error in the spoken word. Therefore, if after a consideration of the surrounding circumstances, the pertinent facts and all the evidence in a particular case, the court concludes that enforcement of the agreement will not subject the defendant to fraudulent claims, the purpose of the Statute will best be served by holding the note or memorandum sufficient even though it is ambiguous or incomplete.

*Sterling v. Taylor*, 40 Cal.4th 757, 770-72 (2007) (*quoting* 10 WILLISTON ON CONTRACTS (4th ed.1999) § 29:4, pp. 437-438). It is a firmly rooted legal principle in this state that "the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme." *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30 (1985).

In *Wilk v. Vencill*, 30 Cal.2d 104 (1947), the defendants reneged on an oral agreement to sell real property. The plaintiffs had given up a chance to buy another comparable house and spent time working on the property before defendants refused to go through with the contract. The court held that these facts, if proven, were enough to estop defendants from relying on the statute of frauds. *See Wilk*, 30 Cal.2d at 106-08. Furthermore, "A parol promise to pay for improvements made on land is not within the statute of frauds." *Hastings v. Matlock*, 171 Cal. App. 3d 826, 836 (1985).

In *Monarco v. Lo Greco*, 35 Cal.2d 621 (1950), the California Supreme Court held that a defendant is estopped from asserting the statute of frauds when "unconscionable injury ... would result from denying enforcement of the contract after one party has been induced by the other seriously to

change his position in reliance on the contract or ... unjust enrichment ... would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute". *Monarco*, 35 Cal.2d at 739-40 (citations omitted). The high court reaffirmed this estoppel doctrine in 1987, in *Phillippe v. Shapell Industries*, 43 Cal.3d 1247 (1987) ("[E]stoppel is proper to avoid unconscionable injury or unjust enrichment that would result from refusal to enforce an oral promise.");

A court may award damages based on an unenforceable contract if unconscionable injury would result from denying enforcement after one party has been induced to make a serious change of position. *See Earhart v. William Low Co.*, 25 Cal.3d 503, 514-15 (1979). A court may invoke the doctrine of promissory estoppel to bind a promisor "when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Earhart*, 25 Cal.3d at 514-15.

This line of authority, recognizing part performance and estoppel as exceptions to the statute of frauds, has been adopted by the Ninth Circuit. *See, e.g., Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825 (9th Cir. 1971) (where there had been part performance of oral agreement by manufacturer to repurchase inventory of its merchandise from distributor on termination of distributorship, statute of frauds did not, as matter of law, bar enforcement of the oral agreement).

Plaintiffs' justifiable reliance and performance take the oral contract out of the statute of frauds, pursuant to *Wilk, Monarco* and their progeny, including *Cornwell*.

**D.     The Documents Referenced In The Complaint Are Evidence Of A Contract, Whether Oral, Implied Through Conduct, Or Written**

Defendant parses the parties' relationship into isolated moments in order to argue that none of the referenced documents themselves create a contract. Defendant misses the forest for the trees. The question is not whether any particular document alone creates a contract, but whether the collection of documents, verbal representations, performance, reliance, unjust enrichment, and catastrophic damages together are sufficient to allow some relief to Plaintiffs. Plaintiffs submit that the documents are part of the evidence of the car wash agreement.

**E.     Plaintiffs Have Properly Pled Their Causes Of Action For Misrepresentation**

    **1.     Plaintiffs Have Alleged Actionable Concealment By Defendant**

Federal Rule of Civil Procedure 9(b) requires that "when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotations and citations omitted). "The allegations must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id*. "However, the requirement of specificity is relaxed when the allegations indicate that the defendant must necessarily possess full information concerning the facts of the controversy or when the facts lie more in the knowledge of the opposite party." *Comerica Bank v. McDonald*, 2006 WL 3365599 (N.D.Cal. 2006).

A complaint alleging fraud is not deficient for failing to state every detail that might be proper subject for interrogatories. *See In re Sunrise Securities Litigation*, 793 F.Supp. 1306 (E.D.Pa.1992). A motion to dismiss under this rule will be denied if the pleading contains some allegations of fraud. *See Giuliano v. Everything Yogurt, Inc.*, 819 F.Supp. 240 (E.D.N.Y.1993).

The pleading with particularity requirements are relaxed somewhat when the alleged fraud arises from the speaker's omission of material facts, as one cannot allege with particularity the time, place, and contents of something that was never said. *See, e.g., S.E.C. v. Nacchio*, 438 F.Supp.2d 1266 (D.Colo.2006). Here, Plaintiffs alleged:

In January 2003, Defendant offered Plaintiffs the opportunity to make improvements to the station pursuant to the new rent reimbursement program. (Compl., ¶ 7.) On July 24, 2003, Plaintiffs wrote a letter to Defendant, announcing Plaintiffs' intention to convert a service bay into a car wash, pursuant to the reimbursement program. (Compl., ¶ 7.) This letter included a paragraph explaining that Plaintiffs were expecting to receive rental reimbursement for the costs of the car wash installation. (Compl., ¶ 7.) On July 25, 2003, Defendant replied with a letter that indicated Defendant's approval of the car wash installation and made no mention that the project was not reimbursable. (Compl., ¶ 7.)

Plaintiffs spent hundreds of thousands of dollars over the next several years, updating Defendant throughout. (Compl., ¶ 8.) Defendant not only knew about the project details and the substantial efforts Plaintiffs were making, but helped Plaintiffs get financing for it. (Compl., ¶¶ 8-9.)

On June 14, 2006, after nearly three years of work and expense, Defendant first stated that it would not reimburse Plaintiffs because there was no existing rent waiver program. (Compl., ¶ 11.) Defendant apparently cancelled the program it had offered to Plaintiffs and on which Plaintiffs had been relying, yet failed to ever inform Plaintiffs about this change. (Compl., ¶ 11.)

By not informing Plaintiffs there was no rent reimbursement program, or that Plaintiffs were not entitled to reimbursement, Defendant repeatedly concealed materials facts from Plaintiffs. (Compl., ¶ 27.) In concealing these material facts, Defendant induced Plaintiff into investing hundreds of thousands of dollars in the construction of a car wash on Defendant's property. (Compl., ¶ 28.) Plaintiffs alleged the specific persons with whom they worked on the car wash project and the dates as best they could be recollected. (Compl., ¶¶ 7-9, 11, 13.)

In summary, Plaintiffs alleged that Defendant concealed the fact it had allegedly stopped the rent reimbursement program at some point, but nevertheless encouraged Plaintiffs to continue spending their money developing Defendant's property.   This was a sufficient allegation of concealment, which replaces the affirmative representation element of a fraud claim when the tortious conduct is concealment rather than affirmative misrepresentation. *See McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, (2008). Together, these allegations are sufficient to apprise Defendant of the claims asserted and the factual bases for them.   During discovery, the parties will be able to establish the details with more precision, although one imagines that this is not particularly necessary for Defendant, which already possesses the information.

### 2.    Plaintiffs Have Alleged Defendant's Knowledge Of Falsity

Rule 9(b) provides, in part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. <u>Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally</u>."   FRCP 9(b) (emphasis added). Because Plaintiffs allege concealment, the pleading requirements are relaxed somewhat. *See Nacchio,* 438 F.Supp.2d 1266.

Here, Plaintiffs alleged:

Bill Brasher sent Plaintiffs an email on September 26, 2006 stating that 'economic incentive programs previously promoted by Defendant and its predecessors are not available at this time.' Apparently, all of Defendant's rent reimbursement programs were cancelled, yet Plaintiffs had never been informed of this." (Compl., ¶ 11.)

As described herein, Defendant knowingly and repeatedly misrepresented and concealed materials facts from Plaintiffs including, but not limited to, Plaintiffs' entitlement to rent reimbursement for improvements that they made to the gas station and, indeed, the very existence of a rent reimbursement program. For the reasons set out above, Plaintiffs had a reasonable belief that they were entitled to rent reimbursement for the total cost of improvements that they made to the gas station. Defendant, knowing that Plaintiffs were expecting reimbursement, waited three years and allowed Plaintiffs to spend hundreds of thousands of dollars installing a car wash before telling them that they were not entitled to rent reimbursement. (Compl., ¶ 27.)

In misrepresenting and concealing these material facts, Defendant intended to, and did, induce Plaintiffs into investing hundreds of thousands of dollars in the construction of a car wash at the San Ramon gas station. (Compl., ¶ 28.)

These allegations are sufficient to apprise Defendant of the essential facts of the claim—that Defendant intentionally withheld information from Plaintiffs and thereby caused Plaintiffs to believe and act upon the false premise that Defendant would reimburse the car wash expenses through a rent waiver.

### 3. Plaintiffs Have Alleged Their Justifiable Reliance

Plaintiffs have plainly alleged justifiable reliance. (Compl., ¶¶ 29, 34.) Therefore, Defendant asks the Court to determine at the pleading stage that this reliance was unjustifiable as a matter of law. The Court should decline this invitation, as this is a classic jury question. Additionally, it was reasonable for Plaintiffs to rely on Defendant's promises, in light of the ongoing business relationship and considering the prior oral promise regarding the snack shop, which did not culminate into a written agreement until after the fact. It was also reasonable to assume that Defendant would honor its commitment in light of its knowledge and participation in the car wash project for several years. It was also reasonable to assume Defendant would follow through with its end of the bargain because the station expansion invariably leads to more profits from increased sales of gasoline and other products, with no real cost to Defendant, which is why Defendant repeatedly encourages its dealers to make this type of upgrade.

Defendant's one case, *Hackethal v. National Casualty Co.*, 189 Cal. App. 3d 1102, 1111 (1987) is unavailing. First, it was decided after a jury trial, not at the pleading stage. Second, the facts are entirely distinguishable. In *Hackethal*, a doctor purchased an insurance policy which provided

1  payments for time the insured spent in court defending a malpractice action. The attorney general filed

2  an accusation against the doctor charging him with gross negligence, incompetence and criminal acts

3  and sought to revoke his license to practice medicine. The doctor sought payment under the policy for

4  the days he spent testifying before the medical review board. The insurer denied coverage and the

5  doctor sued for bad faith denial of coverage and for fraud. A jury found in favor of the doctor and the

6  trial court granted the insurers' motion for judgment notwithstanding the verdict. The appellate court

7  found the policy language clearly precluded payment for days the doctor spent in the hearings because

8  was not a "defendant" and the proceeding was not an action for damages for medical malpractice. *See*

9  *Hackethal*, 189 Cal. App. 3d at 1110. The language in the policy left no doubt that it did not cover the

10  hearings and the doctor admitted that the agent "never told him the policy provided coverage for

11  administrative hearings." *See id.* at 1111. Under these circumstances, the court found that, even if the

12  doctor had relied on statements by the insurance agent, nine years earlier, reliance on such statements

13  would have been unjustifiable as a matter of law.

14      Here, conversely, Defendant told Plaintiffs that they would be reimbursed for the station

15  improvements and actively participated in the improvement process, never telling Plaintiffs that they

16  would not be reimbursed. It was not until years later, when Plaintiffs made a claim for reimbursement

17  that Defendant suddenly changed its position. As Judge Walker observed in *Olsen v. Provident Life &*

18  *Acc. Ins. Co.*, 1998 WL 410888, (N.D.Cal.1998), the rule applied in *Hackethal* "does not necessarily

19  preclude an insured from pursuing a claim that an insurance agent made a misrepresentation in

20  response to particular questions about the policy." *Olsen*, 1998 WL 410888 at *3. In *Olsen*, the

21  insured alleged that the agent affirmatively responded to specific questions about policy coverage. *See*

22  *id.* at *4. Under those circumstances, similar to this case, the *Olsen* court concluded that it could not

23  decide the plaintiff's reliance was unjustifiable as a matter of law. *See id.*

24      **4.**    **Plaintiffs Are Not Required To Alleged A Resulting Benefit To Defendant,**
**But They Have Nevertheless Done So**

25

26      As stated by Defendant's case, *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100

27  F.Supp.2d 1086, 1093 (C.D.Cal. 1999): "The elements of fraud and deceit are (1) misrepresentation;

28  (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damages."

1    Although the Ninth Circuit has required plaintiffs to specify any benefits the defendant received, this

2    does not mean that pleading such a benefit is an element of the claim.  In other words, if the defendant

3    receives some particular benefit, then the plaintiff should allege it with reasonable specificity in order

4    "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged

5    so that they can defend against the charge and not just deny that they have done anything wrong."

6    *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir.1993). But just because a defendant does not

7    directly benefit from its tortious conduct, this does not preclude a plaintiff from recovering for fraud.

8            Although not required to do so, Plaintiffs have alleged that Defendant received benefits:

9            a.      Plaintiffs spent $455,000 on Defendant's property, resulting in a fully functioning car

10   wash that was projected to increase the sale of fuel and other products at Defendant's station.

11   (Compl., ¶¶ 10, 19, 22, 29, 30, 33, 35.)   Whether Defendant took advantage of the benefit, rejected it,

12   or is letting the benefit lay dormant until this case concludes, does not change the fact that Plaintiffs

13   conferred the benefit in the first place.  The car wash was in operation when Defendant terminated the

14   franchise.  The fact that it then decided not to use the wash and to require Plaintiffs to remove as much

15   of it as possible does not change the fact that Defendant initially obtained the benefit it sought.

16           b.      Plaintiffs spent two years and considerable expense to persuade the City of San Ramon

17   to grant a use permit for the car wash on Defendant's property.  (Compl., ¶¶ 8, 10.)  This means that

18   Defendant has the benefit of that use permit, which increases the value of Defendant's land and also

19   will increase the value and profitability of the station when Defendant reopens the car wash.

20           c.      Plaintiffs spent thousands of dollars on experts, including an architect, sound engineer

21   and civil engineer to ensure that the car wash would have a minimal negative impact on the

22   surrounding community. (Compl., ¶ 8.) This means that Defendant does not have to incur this expense

23   or uncertainty when it reopens the car wash.   That these thorny issues have been resolved also

24   increases the value of Defendant's land and also will increase the value and profitability of the station

25   when Defendant reopens the car wash.

26   **F.     Plaintiffs Have Stated A Claim Under Business & Professions Code Section 17200**

27           The California Business and Professions Code prohibits any business practice that is "unfair"

28   or "unlawful". *See* Cal. Bus. & Prof. Code § 17200, *et seq*. "Section 17200 'borrows' violations of

---

other laws and treats them as unlawful practices independently actionable under section 17200, *et seq.* Determination of whether a business practice or act is 'unfair' within the meaning of [17200] entails examination of the impact of the practice or act on its victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. <u>In general the 'unfairness' prong has been used to enjoin deceptive or sharp practices. This court has held that an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."</u> *Gafcon, Inc. v. Ponsor & Assoc.* (2002) 98 Cal. App. 4th 1388, 1425 fn 15 (citations and quotations omitted, emphasis added).

In the section dedicated to the 17200 claim, Plaintiffs allege myriad unfair and unlawful acts by Defendant, both against Plaintiff and against other similarly situated dealers. (Compl., ¶¶ 36, 39, 40.) These allegations and others throughout the complaint set forth Defendant's "sharp," "deceptive," and "unfair" practices which are "immoral, unethical, oppressive, unscrupulous or substantially injurious". Therefore, Plaintiffs have met their obligation to allege a violation under Section 17200, *et seq.*

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny in its entirety Defendant's motion to dismiss. Should the Court determine that any claims require factual clarification, Plaintiffs request that the Court grant leave to amend.

Dated: June 11, 2008            LAW OFFICE OF ANTHONY J. SPERBER


By: _____

Anthony J. Sperber
Attorney for Plaintiffs Charles Davidson and
CD & PWS Enterprises, Inc.